


**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

IN RE: SMITH & NEPHEW BIRMINGHAM HIP RESURFACING (BHR) HIP IMPLANT PRODUCTS LIABILITY LITIGATION *

MDL No. 2775
Master Docket No. 1:17-md-2775

JUDGE CATHERINE C. BLAKE

THIS DOCUMENT RELATES TO ALL TRACKS

*
*
*
*
***

**Memorandum**

Pending before the court are the plaintiffs' two letter motions to compel (ECF Nos. 1204 & 1475). The plaintiffs seek to obtain various documents from Smith & Nephew, which Smith & Nephew has alleged are covered by either attorney-client privilege, work-product protection, or both. The issues have been briefed fully and oral argument was heard.

**Background**

The plaintiffs seek to compel production of several documents from Smith & Nephew. These documents include: (1) the "Metal-on-Metal Hip Arthroplasty, a Briefing Document" [the "Briefing Document"]; (2) Board of Director Meeting Minutes ["Meeting Minutes"] from April 12, 2012, October 31, 2012, and July 31, 2013; and (3) eight copies of a PowerPoint presentation that was presented to the Board of Directors in conjunction with the Briefing Document.

As background, in 2012, litigation was both pending and anticipated against Smith & Nephew related to its "Metal-on-Metal" ("MoM") hip replacement devices. (*See* Def.'s Resp. Opp'n Pls.' Mot. Ex A Campo Decl. ¶ 4, ECF No. 1317-1; *id.* Ex B Austin Decl. ¶ 4, ECF No.

1317-2).[1] The Briefing Document originated from a request by internal Smith & Nephew counsel to outside counsel at Freshfields Bruckhaus Deringer LLP ("Freshfields") for assistance and legal advice to the Smith & Nephew Board of Directors regarding current and anticipated litigation issues. Freshfields drafted a document, which was marked "legally privileged and confidential." (Def.'s Resp. at 7, ECF No. 1317 (citing Campo Decl. ¶ 4)). Smith & Nephew, in consultation with Freshfields, decided to expand this document into what became the Briefing Document. (*See* Austin Decl. ¶ 9). It appears that Blair Fraser of Smith & Nephew was involved with the collection and incorporation of additional information, including clinical summaries, into the document. (*See* Pls.' Letter Brief Ex D ["Fraser Dep."] at 12-14, ECF No. 1205-1). Drafts were circulated to in-house and outside counsel for comments. (*See* Austin Decl. ¶¶ 9–10). In its final form, the Briefing Document consists of sixty-two pages, prefaced by an Executive Summary. It is dated March 4, 2012.

The Meeting Minutes range in length from six to nine pages. Most of the contents of the Meeting Minutes were redacted from Smith & Nephew's *in camera* submission as non-responsive.[2] A portion of the April 12, 2012, minutes, however, summarize a presentation by Chief Legal Officer John W. Campo, Jr., related to the Briefing Document. (Pls.' Letter Brief Ex E at 4, ECF No. 1205-2; Campo Decl. ¶ 6). Mr. Campo called on Dr. A Weymann to present a PowerPoint summary of certain aspects of the Briefing Document. (*Id.*). The October 31, 2012, and July 31, 2013, minutes also reflect legal presentations by Mr. Campo. (Campo Decl. ¶ 7).

---

[1] These exhibits are partially redacted. In conducting its analysis, the Court also reviewed unredacted versions of the Campo and Austin Declarations, submitted *ex parte*. (ECF Nos. 1235-1 and 1235-2).

[2] The court reviewed all the disputed documents *in camera* and *ex parte*.

Finally, the eight copies of the PowerPoint presentation are virtually identical. Seven are identical and one is identical but for the addition of two slides not found in the seven other copies of the presentation.

**Analysis**

"The work-product privilege protects from discovery 'an attorney's work done in preparation for litigation.'" *In re Grand Jury Subpoena*, 870 F.3d 312, 316 (4th Cir. 2017) (quoting *In re Grand Jury Proceedings #5*, 401 F.3d 247, 250 (4th Cir. 2005)). The protection extends to both "'fact' work product and 'opinion' work product," *Proceedings #5*, 401 F.3d at 250, though opinion work product is afforded "greater protection" than fact work product, *Grand Jury Subpoena*, 870 F.3d at 316. Opinion work product "represents the actual thoughts and impressions of the attorney," and "can be discovered only in very rare and extraordinary circumstances." *Id.* (citing *In re John Doe*, 662 F.2d 1073, 1080 (4th Cir. 1981)). Fact work product, on the other hand, "is a transaction of the factual events involved and may be obtained upon a mere showing of both a substantial need and an inability to secure the substantial equivalent of the materials by alternate means without undue hardship." *Grand Jury Subpoena*, 870 F.3d at 316 (citing *In re Grand Jury Proceedings, John Doe*, 102 F.3d 748, 750 (4th Cir. 1996)).

The attorney-client privilege protects "[c]onfidential disclosures by a client to an attorney made in order to obtain legal assistance," and the burden is on the party asserting the privilege to establish that it applies. *In re Grand Jury Subpoena: Under Seal*, 415 F.3d 333, 338–39 (4th Cir. 2005). The privilege also protects "an attorney's advice provided to a client," 102 F.3d at 750; it aims to safeguard and encourage "full and frank communications between attorney and their clients and thereby promote broader public interest in the observance of law and the administration of justice," *Proceedings #5*, 401 F.3d at 250 (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)). If a party is able to establish that the attorney-client privilege applies, "the privilege

affords all communications between attorney and client absolute and complete protection from disclosure." *In re Allen*, 106 F.3d 582, 600 (4th Cir. 1997).

The Fourth Circuit has adopted the "classic test" for attorney-client privilege:

> The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

*Under Seal*, 415 F.3d at 338 n.3 (citing *United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir.1982)); *see also Allen*, 106 F.3d at 600.

The Fourth Circuit also has explained that the privilege extends to investigations conducted for the purpose of providing legal advice. *See In re Allen*, 106 F.3d at 601–02. The privilege "exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." *In re Allen*, 106 F.3d at 601 (quoting *Upjohn*, 449 U.S. at 390). And the "retention of outside counsel indicates that [a company] wanted someone who could collect and 'sift [] through the facts with an eye to the legally relevant,'" *In re Allen*, 106 F.3d at 602 n.9 (quoting *Upjohn*, 449 U.S. at 390–91), though "a lawyer's status as in-house counsel 'does not dilute the privilege,'" *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 758 (D.C. Cir. 2014) (quoting *In re Sealed case*, 737 F.2d 94, 99 (D.C. Cir. 1984)).[3] Further, courts recognize that organizations' internal investigations may often serve

[3] Further, "communications made by and to non-attorneys serving as agents of attorneys in internal investigations are routinely protected by the attorney-client privilege." *Kellogg*, 756 F.3d at 758 (citing *FTC v. TRW, Inc.*, 628 F.2d 207, 212 (D.C.Cir. 1980)).

more than one purpose. *In re Kellogg*, 756 F.3d at 759–60. But regardless, the privilege will continue to apply so long as "one of the significant purposes of the internal investigation was to obtain or provide legal advice." *Id.* at 760.

### 1. The Briefing Document

Smith & Nephew argues that the Briefing Document is covered by both the work-product protection and the attorney-client privilege. (Def.'s Resp. at 2, 5–12, ECF No. 1317). The court agrees.

Outside counsel at Freshfields spearheaded the creation of the Briefing Document, and its primary aim was to provide legal advice to Smith & Nephew's Board of Directors. (*See* Austin Decl. ¶¶ 9–10). The Briefing Document's Executive Summary sets forth the company's legal position and litigation strategy. The plaintiffs have suggested that portions of the Briefing Document are purely factual and, therefore, should be subject to discovery. But, by the court's reading, the clinical information provided in the Briefing Document is interwoven with counsel's legal advice. The factual information informs the legal strategy and was likely compiled in order to assist in the provision of legal advice and to provide context to facilitate the Board of Director's understanding of the legal advice. *See In re Allen*, 106 F.3d 582; *see also Kellogg Brown*, 756 F.3d 754. Because it appears that the primary purpose of the Briefing Document was to provide legal advice to the Board of Directors, the attorney-client privilege attaches to the Briefing Document.

The Briefing Document also is covered by the work-product protection. The Document details both pending and anticipated litigation and sets forth a litigation strategy for Smith & Nephew. As the Document was prepared in anticipation of litigation, the work-product protection applies. *Grand Jury Subpoena*, 870 F.3d at 316. Further, the plaintiffs have not set forth any

argument of substantial need or undue hardship that would justify compelling production of the factual portions of the Document. *Id.*[4]

**2. The Board Meeting Minutes**

The attorney-client privilege and work-product protection also apply to the Meeting Minutes. As detailed above, the Briefing Document was created in order to provide legal advice to the Board of Directors. The Meeting Minutes summarize the presentation of this information to the Board and detail the current state of pending and anticipated litigation against Smith & Nephew. (*See* Campo Decl. ¶¶ 6–7). Accordingly, both the work-product protection and the attorney-client privilege apply. *See Grand Jury Subpoena*, 870 F.3d at 316; *Under Seal*, 415 F.3d at 338.

**3. The PowerPoint Presentations**

Smith & Nephew alleges that the PowerPoint presentations are covered by the attorney client privilege and the work-product protection. (Def.'s Resp. Opp'n Pl.'s Mot ["Def.'s Resp. II"] at 8, ECF No. 1500). The court's consideration of the PowerPoint presentation is complicated by two factors: (1) the presentation was inadvertently produced by Smith & Nephew and by M Squared, a third-party organization, during discovery; and (2) Smith & Nephew shared the presentation with M Squared in order to assist M Squared in its work supporting a presentation Smith & Nephew was making to the FDA.[5] The court first considers whether the attorney-client privilege and the work-product protection apply to the PowerPoint presentation and then considers these two complicating factors in turn.

[4] They may still obtain this factual information by the ordinary discovery process, but are not entitled to the Document itself.

[5] Smith & Nephew has not argued that the attorney-client privilege continued to apply to the presentation that Smith & Nephew shared with M Squared. (*See* ECF No. 1500 at 9–10).

The PowerPoint presentation was developed to facilitate the presentation of the Briefing Document to the Board of Directors. During the April 12, 2012, meeting of the Board, Mr. Campo introduced the presentation and advised the Board that the Briefing Document, a legally privileged and confidential document, had been prepared upon counsel's request. (Pls.' Letter Brief Ex E at 4, ECF No. 1205-2). Dr. Weymann then presented the PowerPoint presentation, which dovetailed with the Briefing Document and summarized its main conclusions. (*Id.*; Def.'s Resp. II Ex A ["Weymann Decl."] ¶ 4, ECF 1500-1). The PowerPoint presentation contains clinical information regarding the MoM devices, which appears to have been intended to provide necessary background for the Briefing Document's discussion of pending and anticipated litigation. Presentations or documents often have multiple purposes but the attorney-client privilege continues to apply so long as the primary purpose of the document was the provision of legal advice. *In re Kellogg*, 756 F.3d at 760. Because the Briefing Document and the PowerPoint presentation appear to have been developed in conjunction with each other in order to provide legal advice to the board and in anticipation of pending litigation, both the attorney client privilege and the work-product protection apply. *See Grand Jury Subpoena*, 870 F.3d at 316; *Under Seal*, 415 F.3d at 338.

Next, the court considers whether the inadvertent production of the PowerPoint presentation constitutes waiver. During the course of discovery, Smith & Nephew inadvertently produced five copies of the presentation and M Squared produced two copies of the PowerPoint presentation. (Def.'s Resp. II at 4). Federal Rule of Evidence 502 governs limitations on waiver. Fed. R. Evid. 502. Specifically, Rule 502(b) states that disclosure during the course of a federal proceeding will not operate as a waiver if "(1) the disclosure is inadvertent; (2) the holder of the privilege or protection took reasonable steps to prevent disclosure; and (3) the holder promptly took reasonable steps to rectify the error, including (if applicable) following Federal Rule of Civil

Procedure 26(b)(5)(B)." *Id.* In some instances, an agreement between the parties, such as the ESI Order in this case, may supplant Rule 502. An agreement between the parties will supplant Rule 502, however, only if the agreement "provide[s] concrete directives regarding each prong of Rule 502(b)." *Maxtena, Inc. v. Marks*, 289 F.R.D. 427, 444 n. 16 (D. Md. 2012). In this case, the party's ESI order appears to be coextensive with Rule 502. The ESI agreement states "[t]his Order shall be interpreted to provide the maximum protection allowed by Federal Rule of Evidence 502." (ESI Order at 9, ECF No. 492, 494).

Smith & Nephew's efforts prior to and subsequent to the inadvertent disclosures satisfy Rule 502(b). The plaintiffs do not dispute that the disclosures were inadvertent. And Smith & Nephew took reasonable steps to prevent disclosure. Specifically, Smith & Nephew retained UnitedLex, a document vendor, to facilitate the discovery process. (Def.'s Resp. II at 5–6; *id.* Ex E ["Stone Decl."] ¶ 5, ECF No. 1500-5). Smith & Nephew and UnitedLex, in conjunction with Smith & Nephew's outside counsel, implemented quality control measures to safeguard against the inadvertent disclosure of documents. (Stone Decl. ¶¶ 7–10). These quality control measures include training for UnitedLex employees, who conduct the first-level of review, a "second-level review for purposes of quality control," and the provision of sample documents to Smith & Nephew's outside counsel for additional review. (*Id.*). Thus far, UnitedLex has assisted Smith & Nephew in producing more than 95,000 documents. (*Id.* ¶ 6). The court is convinced that these quality control measures rise to the level of "reasonable steps to prevent disclosure" under Rule 502(b). Fed. R. Evid. 502(b). Finally, upon learning of the disclosure, Smith & Nephew promptly clawed the documents back. (Def.'s Resp. II Ex. F, ECF No. 1500-6). Accordingly, the inadvertent production of documents by Smith & Nephew and M Squared did not constitute waiver.

Next, the Court considers whether Smith & Nephew waived its work-product protection by sharing the PowerPoint presentation with M Squared. M Squared is a consulting firm. (Def.'s Resp. II Ex C ["Velez-Duran Decl."] ¶ 2, ECF No. 1500-3). Smith & Nephew hired M Squared to assist Smith & Nephew in preparing for a presentation to a panel of the United States Food and Drug Administration. (Velez-Duran Decl. ¶ 3; *id.* Ex B ["Fraser Decl."] ¶ 4, ECF 1500-2). Smith & Nephew shared this information with the agreement that M Squared would not provide the information to any other parties without Smith & Nephew's consent. (Velez-Duran Decl. ¶ 3; Fraser Decl. ¶ 5). "Disclosure to a person with an interest common to that of the attorney or the client normally is not inconsistent with an intent to invoke the work product doctrine's protection and would not amount to such a waiver." *In re Doe*, 662 F.2d 1073, 1081 (4th Cir. 1981); *see also In re Martin Marietta Corp.*, 856 F.2d 619, 625 (1988) (concluding that there had been an implied waiver of the work-product protection because information had been shared with a third-party with whom there was no "community of interest").

Here, M Squared was hired to assist Smith & Nephew in preparing for its presentation to the FDA. There is no indication that M Squared's interests departed from Smith & Nephew's. Further, the court has not been presented with any evidence that suggests the information Smith & Nephew shared with M Squared was included in any public presentation to the FDA. Finally, upon learning that that these documents had been produced by M Squared, Smith & Nephew clawed them back. (Def.'s Resp. II Ex. D, ECF No. 1500-4). Accordingly, sharing the PowerPoint presentation with M Squared did not constitute a waiver of work-product protection.

## Conclusion

For the reasons stated above, the court will deny the plaintiffs' motions. A separate order follows.

5/31/19
Date

CCB
Catherine C. Blake
United States District Judge